UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DONNA HANNAN,

Plaintiff,

v.

TETON WEST OF IDAHO, LLC,

Defendant.

Case No. 4:25-cv-00050-AKB

**MEMORANDUM DECISION AND ORDER**

## I. INTRODUCTION

Before the Court are Defendant Teton West of Idaho, LLC's (TWI) Motion for Summary Judgment (Dkt. 13), Motion to Strike Declarations in Opposition to Motion for Summary Judgment (Dkt. 17), and Plaintiff Donna Hannan's Motion in Limine to exclude certain expert testimony from Robert Conger (Dkt. 15). Having reviewed the record and the parties' submissions, the Court finds oral argument unnecessary and will decide the motions on the record. Dist. Idaho Loc. Civ. R. 7.1(e)(1)(B); *see also* Fed. R. Civ. P. 78(b).

## II. MOTION TO STRIKE

TWI moves to strike paragraph 9 of Amy Nef's declaration and paragraph 18 of Hannan's declaration (Dkt. 17). The Court need not resolve the parties' evidentiary arguments because it does not rely on either challenged statement in resolving TWI's summary judgment motion. Accordingly, it denies TWI's Motion to Strike Declarations in Opposition to Motion for Summary Judgment (Dkt. 17) as moot.

## III. MOTION IN LIMINE

Plaintiff moves to exclude Robert Conger categorically as an expert witness, arguing his anticipated expert testimony will "wholly involve" QuickBooks and that he lacks the specialized knowledge necessary to qualify as an expert (Dkt. 15 at 2–4; Dkt. 21 at 2–5). Having reviewed the challenged disclosures, the Court concludes that at least some of Conger's anticipated testimony is not excludable on the categorical ground asserted, while other proposed opinions may raise questions under Rules 701 and 702 of the Federal Rules of Evidence concerning the scope of his expertise, the basis for his opinions, or the extent to which those opinions depend on specialized knowledge regarding QuickBooks. The parties have not identified and analyzed the challenged opinions with sufficient specificity to allow the Court to conduct an opinion-by-opinion Rule 702 analysis. Accordingly, the Court denies Plaintiff's Motion in Limine (Dkt. 15) without prejudice. Plaintiff may renew particularized objections before trial.

## IV. FACTUAL BACKGROUND

This case arises from TWI's November 2022 termination of Hannan, a seventy-year-old bookkeeper who had worked in that capacity since 2004 and for TWI since 2020 (Dkt. 13-2 at 5, TWI000445; Dkt. 14-2 at 1, ¶¶ 2–3). The principal participants in the events leading to Hannan's termination were Robert Conger, who became TWI's managing partner in October 2022; Dallas Andrus, Hannan's longtime supervisor; Hilary Nash, TWI's former office manager whose theft of company funds prompted an internal financial investigation; and Rainee Yancey, a forty-two-year-old employee, who TWI hired after Nash's termination and who later performed duties that Hannan had performed (Dkt. 13-3 at 48–54, 59–60, 76–77). Hannan contends TWI terminated her because of her age. TWI denies age played any role and cites concerns about Hannan's accounting abilities, job performance, and alleged involvement in or concealment of Nash's misconduct. The

parties sharply dispute several facts bearing on those competing explanations, including when Conger learned Hannan's age, the quality and scope of Hannan's work, whether TWI transferred her duties to Yancey, Hannan's role in Nash's misconduct, and the actual reasons motivating TWI's decision.

Hannan began bookkeeping work for Kevin Bloxham's businesses in August 2004, initially as an employee of KB Concrete. Bloxham later transferred her to TWI, where she began working as a bookkeeper in January 2020 (Dkt. 13-2 at 5, TWI000445; Dkt. 13-3 at 155–56, Hannan Dep. 9:3–10:10; Dkt. 14-2 at 1, ¶¶ 2–3). After Bloxham died in June 2020, TWI owner Dallas Andrus became Hannan's immediate supervisor (Dkt. 14-2 at 1, ¶¶ 2–3). In November 2020, Conger and four other investors purchased TWI from its previous owners (Dkt. 13-3 at 21–22, Conger Dep. 18:3–14, 19:6–11).

Hannan performed bookkeeping functions for TWI, including payroll, accounts payable, and bank and credit-card reconciliations (Dkt. 13-3 at 101–02, Conger Dep. 98:19–99:2; Dkt. 13-3 at 157–58, Hannan Dep. 11:17–12:5). The parties disagree, however, about the precise scope of Hannan's responsibilities before June 2022.

Beginning in approximately June 2021, Conger began working at TWI part-time and investigating discrepancies in TWI's finances (Dkt. 13-3 at 40–45, Conger Dep. 37:9–42:9). That investigation ultimately disclosed that TWI office manager, Nash, had apparently been taking company funds, and TWI terminated Nash on June 16, 2022 (Dkt. 13-3 at 48–53, Conger Dep. 45:2–50:20). Hannan testified that she had identified personal expenditures on Nash's company credit card before Nash's termination. For example, Hannan reviewed a January 2022 Zions Bank statement reflecting a Madison Memorial Hospital charge and wrote "Hilary: Gas, office, and personal" on the statement. Hannan testified that she took a copy of the statement to Dallas and RJ

Andrus (Dkt. 13-3 at 219–21, Hannan Dep. 72:1–74:3). Hannan likewise identified an April 2022 CenturyLink charge as Nash's personal telephone bill and testified that she again brought the matter to Dallas and RJ (Dkt. 13-3 at 221–23, Hannan Dep. 74:7–76:15). Conger testified that reporting questionable transactions to Dallas, Hannan's supervisor, would have been appropriate, but that he never asked Dallas or Hannan whether she had done so (Dkt. 13-3 at 135–36, Conger Dep. 132:17–133:11).

The parties consequently disagree about Hannan's role, if any, in Nash's misconduct. TWI contends that its subsequent review of the financial records led Conger to conclude Hannan had concealed or facilitated Nash's misuse of TWI funds (Dkt. 13-3 at 52–53, 64–65, Conger Dep. 49:4–11, 61:23–62:12). Hannan denies participating in or concealing Nash's conduct and maintains that she was the person who identified and reported suspicious transactions to management, as noted above (Dkt. 14-2 at 2, ¶ 7; Dkt. 14-2 at 5, ¶ 17(b)).

The parties also disagree more generally about Hannan's job performance. TWI identifies delayed bank reconciliations, accounting discrepancies, duplicated entries, and QuickBooks activity as evidence that Hannan was not performing satisfactorily (Dkt. 13-2 at 21–88; Dkt. 13-3 at 252–59, Resp. to Interrog. No. 13). Hannan disputes both her responsibility for some of those matters and TWI's interpretation of the accounting records (Dkt. 14-2 at 4–11, ¶ 17). Two accountants who reviewed TWI's records also described Hannan's work favorably: Amy Nef, who reviewed TWI's QuickBooks monthly through December 2021, states she did not find errors in Hannan's bookkeeping, and Preston Roberts, who performed TWI's annual reviews, states that the firm did not make adjustments to Hannan's bookkeeping and that she was proficient in online QuickBooks (Dkt. 14-1 at 1–2, ¶¶ 2–7; Dkt. 14-3 at 1–2, ¶¶ 2–9).

After Nash's termination, Conger and Dallas Andrus met with Hannan in June 2022 and promoted her (Dkt. 13-3 at 98–100, Conger Dep. 95:19–97:13). Effective June 20—four days after Nash's termination—TWI increased Hannan's annual salary from $46,000 to $50,000 (Dkt. 13-3 at 259, Resp. to Interrog. No. 15). The parties disagree about the precise scope of the additional responsibilities associated with the promotion, but they agree that Conger promised Hannan a company credit card (Dkt. 13-3 at 61–63, Conger Dep. 58:22–60:22; Dkt. 14-2 at 2–3, ¶¶ 9–10).

The parties disagree about when Conger learned Hannan's age. Hannan's TWI personnel file contained her driver's license, which disclosed her date of birth, although Conger testified he never reviewed the file before her termination (Dkt. 13-2 at 8; Dkt. 13-3 at 61, Conger Dep. 58:1–8). Hannan states that, when arranging for the company credit card during the summer of 2022, Conger asked for her Social Security number and date of birth and thereby learned she was seventy years old. Hannan states Conger thereafter became distant and stopped speaking to her as he previously had (Dkt. 14-2 at 3, ¶¶ 10–13). Conger denies asking Hannan for that information and testified that he did not know Hannan's age in 2022; according to Conger, he instructed Rainee Yancey to order the credit card (Dkt. 13-3 at 60–63, Conger Dep. 57:11–60:22; Dkt. 13-3 at 100–01, Conger Dep. 97:14–98:3).

TWI hired Yancey around August 1, 2022. The parties disagree about whether Yancey began replacing Hannan. TWI maintains that it hired Yancey as the new office manager to replace Nash and that Yancey did not assume Hannan's payroll and accounts-payable duties during Hannan's employment (Dkt. 13-3 at 54, Conger Dep. 51:15–52:10; Dkt. 13-3 at 100–02, Conger Dep. 97:24–99:24). Hannan states that, after Conger learned her age, TWI began transferring her bookkeeping work to Yancey, who was then forty-two, and instructed Hannan to train Yancey (Dkt. 14-2 at 3, ¶ 13). Conger disputes this fact and specifically denies instructing Hannan to teach

Yancey Hannan's bookkeeping duties. He acknowledged, however, that TWI was using QuickBooks Online when it hired Yancey, while Yancey's prior QuickBooks training had been on the desktop version, and that Yancey ultimately performed "all of the tasks that Donna Hannan did when she worked there" (Dkt. 13-3 at 76–77, Conger Dep. 73:19–74:10). TWI retained Rudd & Company to provide both Hannan and Yancey training concerning the online version of QuickBooks, with which Yancey had not previously worked (Dkt. 13-3 at 75–76, Conger Dep. 73:23–74:3; Dkt. 13-3 at 101–02, Conger Dep. 99:9–25).

In October 2022, Conger became TWI's managing partner (Dkt. 13-3 at 59–60, Conger Dep. 56:1–57:1). On October 20, TWI's owners met in Pocatello and decided to terminate Hannan. The contemporaneous meeting notes state, under "Donna": "Bob: 'We don't need her.' It's not her fault"; "She just doesn't have any accounting experience"; and "Dallas is going to speak to Donna and let her go by Nov 1, 2022" (Dkt. 13-3 at 277–78, TWI000733–34). Conger testified that he was the person who decided to raise Hannan's termination with the owners and that no formal vote occurred (Dkt. 13-3 at 68–69, Conger Dep. 66:1–67:24). According to Conger, what he told the owners was that Hannan could not do the accounting job and that "it wasn't her fault." (Dkt. 13-3 at 70, Conger Dep. 67:1–24). TWI later identified Conger as the only individual who had input into the decision to terminate Hannan (Dkt. 13-3 at 259, Resp. to Interrog. No. 14).

The October 20 meeting addressed broader business, financial, and personnel matters. The owners discussed a "dry" project pipeline, a forecasted $200,000 annual loss, and approximately two months of expenses with no foreseeable revenue to cover them. The owners also discussed a separate personnel dispute in which one employee had said "it's either me or him"; considered another salesperson for the Magic Valley; unanimously approved hiring Greg Larsen as a salesman at a $100,000 salary plus commission; and approved hiring Conger as managing partner at a

$75,000 annual salary plus benefits. The minutes do not identify a company-wide reduction in force (RIF) or reflect a decision at that meeting to terminate another employee (Dkt. 13-3 at 277–80, TWI000733–36).

On November 2, 2022, Dallas Andrus called Hannan and informed her that TWI was terminating her employment (Dkt. 13-3 at 60, Conger Dep. 57:2–10; Dkt. 13-3 at 189–92, Hannan Dep. 42:20–45:20). No one expressly told Hannan that she was being terminated because of her age (Dkt. 13-3 at 192, Hannan Dep. 45:13–20). The parties disagree about the explanation given during the termination call. Hannan states Dallas told her Conger had decided TWI "didn't need [her] anymore" and that Yancey could perform her work (Dkt. 14-2 at 3–4, ¶ 15). Conger testified that he did not know what Dallas told Hannan; according to Conger, his own position was that TWI "did not need that many people downstairs" (Dkt. 13-3 at 105–06, Conger Dep. 102:23–103:18).

Hannan filed a charge of age discrimination on November 21, 2022 (Dkt. 14-2 at 12, ¶ 20). On December 28, 2022, TWI responded that Hannan "was terminated in association with a company-wide reduction in force following the sale of the company to a new ownership group in October 2020." TWI also asserted that Hannan had been unable to perform assigned tasks timely and accurately and identified a duplicate invoice payment as an example (Dkt. 14-2 at 15–16). The response did not accuse Hannan of participating in or concealing Nash's theft. Conger, who supplied the information underlying TWI's response, later testified that the October 2020 date was erroneous and that the RIF began in 2022. He also acknowledged that TWI hired Yancey and promoted Hannan during that same period (Dkt. 13-3 at 82–85, Conger Dep. 79:10–82:23). In subsequent discovery, TWI identified additional reasons for Hannan's termination, including inadequate accounting knowledge, untimely or incorrect work, and concerns she had participated

in or concealed Nash's theft and credit-card fraud (Dkt. 13-3 at 252–59, Resp. to Interrog. Nos. 12–14).

## V. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the court must "view[ ] the facts in the non-moving party's favor." *Id*. To defeat a motion for summary judgment, the nonmoving party must present evidence upon which a reasonable jury drawing all inferences in favor of the moving party could return a verdict in the movant's favor. *Id*.

The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party cannot simply rely on unsworn assertions or the pleadings to defeat a motion for summary judgment; rather, the nonmoving party must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

**B. Age Discrimination in Employment Act**

The Age Discrimination in Employment Act (ADEA) makes it unlawful "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). The Ninth Circuit evaluates ADEA claims that are based on circumstantial evidence of discrimination by using the three-stage burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Enlow v. Salem–Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004). Under this framework, the employee must first establish a prima facie case of age discrimination. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). If the employee establishes a prima face case, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* If the employer satisfies its burden, the employee must then prove that the reason advanced by the employer constitutes mere pretext for unlawful discrimination. *Id.*

To establish a prima facie case of age discrimination, a plaintiff must establish that she was (1) at least forty years old, (2) performing her job satisfactorily, (3) discharged, and (4) either replaced by a substantially younger employee with equal or inferior qualifications or discharged under circumstances otherwise "giving rise to an inference of age discrimination." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). "As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000).

## VI. ANALYSIS

TWI first argues Hannan failed to create a genuine factual dispute because her opposition memorandum does not cite particular parts of the record as Rule 56(c)(1) requires (Dkt. 18 at 1–

5). Although Hannan's opposition brief does not consistently supply record citations, she filed a separate statement of disputed facts and supporting declarations, and TWI itself relies on many of the same underlying materials (Dkts. 14-1, 14-2, 14-3, 14-4). The Court considers only the record evidence properly before it and identified in the parties' submissions. On this record, the citation deficiency does not eliminate the genuine disputes discussed below.

### A. Prima Facie Case

The first and third elements of Hannan's prima facie case are undisputed. Hannan was seventy years old when TWI terminated her employment. TWI disputes the remaining elements, arguing Hannan was not performing satisfactorily and was not replaced by a substantially younger employee or otherwise discharged under circumstances giving rise to an inference of age discrimination.

TWI's principal argument is that Hannan was not performing her job satisfactorily. TWI relies on records showing delayed bank reconciliations, accounting discrepancies, duplicated check numbers, and other bookkeeping problems, and it maintains that its continuing financial investigation revealed those deficiencies after Hannan's June 2022 promotion (Dkt. 13-4 at 6–10; Dkt. 18 at 8–9). If credited, this evidence would support TWI's characterization of Hannan's performance. But Hannan's burden at the prima facie stage is minimal. TWI promoted Hannan and increased her annual salary from $46,000 to $50,000 only months before terminating her; TWI conducted no formal performance reviews; Hannan had performed bookkeeping work since 2004; and the accountants who reviewed TWI's books described her work positively and did not identify the errors TWI now emphasizes in the work they reviewed (Dkt. 13-3 at 83, 96–97, 259; Dkt. 14-1 at 1–2, ¶¶ 2–7; Dkt. 14-3 at 1–2, ¶¶ 2–9). A jury could accept TWI's explanation that its

investigation uncovered problems after the promotion. The competing evidence nevertheless is sufficient to satisfy Hannan's minimal burden to show satisfactory performance at this stage.

TWI maintains that it hired Yancey to replace Nash as office manager, not Hannan; Hannan and Nash had distinct responsibilities; and to the extent Yancey later acquired duties Hannan had been performing, those duties originally belonged to Nash, and Hannan performed them only temporarily after Nash's termination (Dkt. 18 at 8–9). TWI also points to Yancey's prior experience with QuickBooks Desktop and other accounting software. That evidence could support a finding that Yancey did not literally replace Hannan. But the fourth element may also be satisfied by circumstances otherwise giving rise to an inference of age discrimination. *Diaz*, 521 F.3d at 1207. Hannan was seventy, and Yancey approximately forty-two; Hannan states that TWI had her train Yancey on bookkeeping work; and TWI's reply brief itself characterizes the events as TWI's decision to "hire, and have Ms. Hannan train, Ms. Yancey" (Dkt. 18 at 7). Further, Conger testified that Yancey now performs all work that Hannan had performed. At this stage, the Court need not decide whether Yancey was Hannan's literal, intended replacement. The circumstances are sufficient to satisfy Hannan's minimal burden that Yancey replaced her.

**B. Legitimate, Nondiscriminatory Reasons and Pretext**

TWI has satisfied its burden of articulating legitimate, nondiscriminatory reasons for Hannan's termination. It presently identifies three reasons: Hannan lacked adequate accounting experience; her work was completed late, was inaccurate, and was inefficient; and TWI believed she had participated in or covered up Nash's fraudulent conduct (Dkt. 18 at 9–10). Also, TWI's opening brief frames the termination as part of a broader effort to address financial misconduct in its front office, emphasizing that Nash, Hannan, and a part-time employee, Zoninia Bess, all ultimately left TWI (Dkt. 13-4 at 11–13). TWI argues that Hannan's promotion does not foreclose

these explanations because its continuing investigation revealed Hannan's deficiencies and because multiple legitimate reasons for a decision are not inherently inconsistent. Because these are legitimate, nondiscriminatory explanations for Hannan's termination, the question is whether Hannan has produced sufficient evidence for a reasonable jury to find they are pretextual.

The Court finds that she has. The contemporaneous record of the termination decision permits competing reasonable inferences about why Hannan was terminated. The October 20, 2022, meeting minutes state: "We don't need her. It's not her fault"; "She just doesn't have any accounting experience"; and "Dallas is going to speak to Donna and let her go" (Dkt. 13-3 at 278). TWI reasonably reads that language as confirming that it believed Hannan lacked the accounting skill necessary for the job and refuting the implication that Hannan was terminated due to her age.

TWI's reading, however, is not the only reasonable reading. "We don't need her" can be understood as an admission that Yancey had taken over Hannan's duties; "it's not her fault" undercuts the suggestion she had performance problems; and the reference to Hannan's accounting experience could reasonably be understood as comparing Hannan to another employee who had "accounting" experience in Conger's assessment—Yancey (Dkt. 13-3 at 255; Dkt. 13-3 at 76–77, Conger Dep. 73:19–74:10).

Further, Hannan's accounting experience did not materially change between her June promotion and the October termination decision; TWI raised her salary; there were no formal performance reviews; and the outside accountants who reviewed TWI's books had not identified the deficiencies TWI now emphasizes. On this record, a jury could find the detailed performance problems genuinely motivated the termination, or it could find TWI later developed the proffered explanations for a decision it made for another reason.

Also, what the minutes do not explain is telling. The minutes do not say Hannan was being terminated because her work was chronically late or inaccurate, because she participated in Nash's fraud, or because she was part of a company-wide RIF despite those issues being raised. The Court cannot convert TWI's plausible interpretation of that contemporaneous record into the only reasonable interpretation.

TWI also advances a broader and facially legitimate fraud-prevention explanation. Its opening brief emphasizes that, after discovering Nash's theft, TWI investigated the front office and that Nash, Bess, and Hannan all ultimately left TWI. Based on that sequence of events, TWI explains its concern was eliminating employees connected to the financial problems, not discriminating based on age (Dkt. 13-4 at 12–13). A jury could accept that explanation. The contemporaneous October 2022 minutes, however, discuss Nash's embezzlement immediately after the discussion of Hannan without attributing Hannan's termination to participating in or concealing that misconduct (Dkt. 13-3 at 278). Additionally, Conger testified that he already believed Hannan had covered up Nash's theft by the October 2022 meeting but deliberately did not raise the accusation because he did not want to "drag Donna's name through the mud"; he then testified, "I had no problem with Donna, other than I felt that she could not do the job, and that's what I said in the board meeting" (Dkt. 13-3 at 69). That explanation may persuade a jury. But based on the positive third-party performance assessments and the absence of a fraud-involvement explanation in the minutes for Hannan's termination, a jury could also find TWI's explanation is pretextual.

In December 2022, only months after Hannan's termination, TWI stated that Hannan "was terminated in association with a company-wide reduction in force following the sale of the company to a new ownership group in October 2020" (Dkt. 14-2 at 15–16). A RIF is not

necessarily inconsistent with the contemporaneous statement that TWI did not "need" Hannan; TWI could reasonably argue both reflected a decision to consolidate staffing during financial difficulty. The October 2022 minutes, however, never identify a company-wide RIF or characterize Hannan's termination as part of one. Although the owners discussed a dry project pipeline and substantial anticipated losses, they also approved or considered new hires and resolved no other personnel dispute by termination at that meeting (Dkt. 13-3 at 277–80). Thus, the same contemporaneous record that could support an economic explanation for Hannan's termination also permits a jury to question whether that termination was actually part of a company-wide RIF.

TWI's later treatment of the RIF reinforces, rather than creates, that factual dispute. Conger, testifying as TWI's Rule 30(b)(6) representative, placed the purported RIF sometime in 2022 (not 2020), could not clearly identify how many employees it involved, described the number as "minimal," and responded "I didn't say that" when asked whether the personnel changes he identified constituted the purported company-wide RIF. He also acknowledged that TWI hired Yancey and promoted Hannan during the supposed RIF period (Dkt. 13-3 at 82–85).

Asserting numerous bases for termination, alone, is not enough to find the reasons may be pretextual. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). In *Villiarimo*, the employer consistently asserted its reasons "from the outset"; neither explanation was retracted; and the explanations were not inconsistent. *Id.* TWI is likewise entitled to rely on cumulative reasons, and its explanations may ultimately persuade a jury. But the issue here is not the number of explanations. The contemporaneous minutes permit materially different reasonable interpretations, some of which a jury could easily find are inconsistent with later explanations,

unlike *Villiarimo*. Considered cumulatively, the evidence creates a genuine dispute as to whether the reasons TWI now advances were the reasons that actually motivated Hannan's termination.

This factual dispute is sufficient to create a triable issue of pretext. A reasonable jury could find TWI's proffered reasons unworthy of credence and pretextual for age discrimination. Accordingly, the Court denies TWI's Motion for Summary Judgment (Dkt. 13).

## VII. ORDER

1. Defendant Teton West of Idaho, LLC's Motion for Summary Judgment (Dkt. 13) is **DENIED**.

2. Defendant Teton West of Idaho, LLC's Motion to Strike Declarations in Opposition to Motion for Summary Judgment (Dkt. 17) is **DENIED AS MOOT**.

3. Plaintiff Donna Hannan's Motion in Limine (Dkt. 15) is **DENIED WITHOUT PREJUDICE**.

DATED: September 17, 2026

Amanda K. Brailsford
U.S. District Court Judge